UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA
                                 :
        - v. -                              08 Cr. 36 (JGK)
                                 :
ERIC PEELS,
    a/k/a "Darryl E. Peels,"     :

            Defendant.       :

- - - - - - - - - - - - - - - x


**THE GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN FURTHER RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS**


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York,
Attorney for the United States
of America



AMY LESTER
Assistant United States Attorney

    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA
                                :
        - v. -                                08 Cr. 36 (JGK)
                                :
ERIC PEELS,
     a/k/a "Darryl E. Peels,"   :

                 Defendant.     :

- - - - - - - - - - - - - - - x

**THE GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN FURTHER RESPONSE TO THE DEFENDANT'S MOTION TO SUPPRESS**

     The Government respectfully submits these Proposed Findings
of Fact and Conclusions of Law in further response to the motion
to suppress filed by defendant Eric Peels (the "defendant").

**PRELIMINARY STATEMENT**

     1.   At the suppression hearing held on July 31, 2008, the
Court heard testimony from three police officers who went to
Apartment 3K, located at 3540 Decatur Avenue in the Bronx, to
arrest the defendant on September 29, 2007:  Detective Frankie
Rosado ("Detective Rosado"), Officer Eduardo Matos ("Officer
Matos"), and Sergeant Michael T. O'Rourke ("Sergeant O'Rourke"),
all from the 52nd Precinct of the New York City Police Department
("NYPD") (collectively, the "officers").  The Court also heard
testimony from Sheila Nickens-Thomas (Ms. Nickens-Thomas"), an
investigator from the United States Attorney's Office in the
Southern District of New York, and Todd Trabosci ("Mr.

Trabosci"), a litigation support specialist for Federal Defenders of New York.  The defendant did not testify.

2.   As demonstrated by the testimony presented at the hearing, Patricia Davis ("Ms. Davis"), the resident of the apartment in which the defendant was arrested, consented to the officers' entry into her apartment, both verbally and impliedly, through her conduct.  In addition, the testimony of all three officers demonstrated that the entry was also justified by exigent circumstances.  Finally, the testimony of the two officers involved in the recovery of the firearm from the bedroom where the defendant was found demonstrated that the firearm was both within the defendant's reach and in plain view, and that its seizure was therefore lawful.

3.   The defendant's declaration submitted in support of his motion, which contains claims to the contrary, should not be credited by the Court.  First, the defendant did not testify at the hearing and, therefore, his statements are entitled to less weight than the live testimony of the officers, who were subject to cross-examination.  Second, the defendant's assertions in his affidavit were directly and consistently contradicted by all three police officers who testified at the hearing.

4.   Similarly, the Court should not credit the hearsay statement of Ms. Davis, as related through the testimony of Ms.

2

Nickens-Thomas, that the police officers did not ask for or receive permission to enter her apartment.  The defense had the opportunity to call Ms. Davis and subject her statements to cross-examination, but chose not to, deciding instead to present her statements through Ms. Nickens-Thomas.  As Ms. Nickens-Thomas' testimony demonstrated, Ms. Davis would not have been a credible witness for a number of reasons, including the fact that she was biased, based on her own admissions that she knew the defendant was in trouble with the police when he came to stay with her and that she regularly harbors individuals who are trying to evade apprehension by law enforcement.

5.    Accordingly, the firearm and the defendant's post-arrest statements are properly admissible at trial and the defendant's motion to suppress should be denied in its entirety.

**PROPOSED FINDINGS OF FACT**

**A.    Background**

6.    On September 28, 2007, Detective Rosado learned from one of his colleagues, Detective Rene Canella ("Detective Canella"), that the defendant was wanted in connection with an assault with a weapon that had taken place on September 26, 2007. (Tr. at 8; DX B (Complaint Follow Up Informational Report listing

date of original report as 9/26/2007)).[1]  According to Detective

Canella, the defendant had pistol-whipped his girlfriend.  (Tr.

at 8).  Detective Canella asked Detective Rosado to make efforts

to arrest the defendant and provided Detective Rosado with a

photograph of the defendant.  (Tr. at 8).  After looking at the

photograph, Detective Rosado recognized the defendant, both

because he had arrested the defendant previously in 2006 in

connection with a misdemeanor assault case involving the same

victim, and because he considered the defendant to be a suspect

in an ongoing investigation involving a shooting that had taken

place approximately one month earlier.  (Tr. at 8-10).

        7.    On September 29, 2007, Detective Rosado followed up on

the assault case involving the defendant by going to the victim's

apartment to see if she knew the defendant's whereabouts.  (Tr.

at 11-12).  The victim had not seen the defendant, but she

informed Detective Rosado of the details of the assault.  (Tr. at

12, 14).  The victim told Detective Rosado that she had walked

out of her apartment into the lobby area of the building when the

elevator door opened.  (Tr. at 14).  The defendant stepped out of

---

[1]     "Tr." refers to the transcript of the suppression hearing
held on July 31, 2008; "GX" refers to Government exhibits
admitted into evidence at the hearing; "DX" refers to defense
exhibits admitted into evidence at the hearing; and "Peels Decl."
refers to the Declaration of Eric Peels dated July 3, 2008, which
was submitted in support of the motion to suppress.

the elevator with two friends, pulled a gun from his groin area, and started hitting her with it. (Tr. at 14). The victim managed to escape from the defendant, ran into a store, and called 911. (Tr. at 14).

8. The defendant's mother was also present at the victim's apartment on September 29th. (Tr. at 12). She gave Detective Rosado the keys to her apartment, which was located on a different floor in the same building, and asked him to check if the defendant was there. (Tr. at 12). Detective Rosado did so, but the defendant was not in his mother's apartment. (Tr. at 12). The victim told Detective Rosado about two locations where the defendant might be staying, one "up the block" on Gun Hill Road, and one on Decatur Avenue. (Tr. at 12). Detective Rosado went to those two locations, but he did not find the defendant, so he returned to the 52nd precinct. (Tr. at 12-13, 15).

9. At the precinct, Detective Rosado was notified that the NYPD's Emergency Services Unit ("ESU") was planning to enter the defendant's mother's apartment to search for the defendant. (Tr. at 15). Detective Rosado returned to the mother's apartment. (Tr. at 15). When he arrived, ESU had already searched the apartment and found a bullet-proof vest. (Tr. at 15). As Detective Rosado was leaving the building, the victim introduced him to the defendant's sister. (Tr. at 16). Detective Rosado

5

asked the defendant's sister if she could talk to the defendant
and try to get him to surrender to the police, but she stated,
"No, you can't talk to him no more, there's no, you know, way of
reaching him . . . ." (Tr. at 16). When the defendant's sister
suggested that Detective Rosado try talking to the defendant's
friends, who were standing nearby, Detective Rosado approached
them, gave them his card, and asked them to reach out to him and
try to convince him to surrender to the police so that "he don't
get hurt, none of us get hurt." (Tr. at 16). One of the friends
told Detective Rosado, "He's gone. He don't listen to nobody
. . . ." (Tr. at 19). Detective Rosado then returned to the
precinct. (Tr. at 17).

    10.    Shortly after arriving at the precinct, Detective
Rosado received a phone call from the defendant. (Tr. at 17).[2]
During the call, Detective Rosado offered to go out and pick up
the defendant personally if he wanted to surrender, telling him,
"If you want, I'll pick you up, that way -- everybody gets
nervous when it comes to stuff like that. Now everybody's
looking for you, so let's make it easy." (Tr. at 17-18).
According to Detective Rosado, the defendant responded,

---

[2]    Detective Rosado testified that he knew he was speaking with
the defendant because when he said, "Eric, it's me, Rosado," the
defendant did not say, for example, "No, this is not Eric, it's
Billy." (Tr. 18).

"[W]hoever comes here, Rosado, whoever comes after me, you're going to have to kill me or I'm going to kill you guys.  I'm not coming in."  (Tr. at 18).  After the defendant hung up the phone, Detective Rosado printed out copies of an NYPD mugshot pedigree sheet with the defendant's photograph on it for the desk sergeant at the precinct to hand out to all units, informing the sergeant of the substance of the threats the defendant had made on the phone.  (Tr. at 19; GX 3501-G).[3]  Detective Rosado testified that he took the defendant's threats seriously and believed that the defendant might shoot at the police.  (Tr. at 44).

**B.    The Arrest**

11.    Shortly after speaking to the defendant, Detective Rosado received a phone call from Detective Maldonado, who was assigned to the Crimestoppers tip line at police headquarters, informing him that a tipster had called in with information about the location of an individual for whom the police were looking.  (Tr. at 21, 44; DX B).  Detective Rosado learned from Detective Maldonado that the tipster said the police had just left the block and that he knew where the "guy" they were looking for was

---

[3]    The mugshot pedigree sheet indicates that the defendant was arrested in 2003 for assaulting a police officer.  (Tr. at 43; GX 3501-G).  Officer Matos testified that he received a copy of the mugshot pedigree sheet when he started his shift on the day of the defendant's arrest.  (Tr. at 92).

staying -- in an apartment in the last building on the right side
of Decatur Avenue, by the cemetery. (Tr. at 21-22). Although
the tipster did not know the exact building number, he did
provide a specific apartment number. (Tr. at 22). A short time
later, Detective Rosado received two separate calls from the
tipster himself, in which the tipster verified the information he
had provided previously and told Detective Rosado the number of
the building where the individual was staying. (Tr. at 22).[4]
The tipster also agreed to stand in front of the building until
the police arrived and to give a signal to Detective Rosado in
order to indicate that the police were focused on the correct
building. (Tr. at 22).

      12.  Immediately after receiving these calls, Detective
Rosado contacted Sergeant O'Rourke and other members of the

_____

[4]      Although the tipster referred to the "guy" wanted by the
police as "BI" (see DX B), and Detective Rosado testified that he
did not know whether that was the defendant's nickname (Tr. at
49, 52), the evidence presented at the hearing made clear that
"BI" refers to the defendant. Detective Rosado testified that
the information he had obtained from the narcotics squad about
the shooting in which the defendant was a suspect had included
mention of the name "BI." (Tr. at 51). Detective Rosado further
testified that the tipster specifically stated that the police
had been on the block looking for "BI," and since the police had
been on the block earlier in the day looking for the defendant,
it was "obvious[ ], we're talking about Mr. Peels." (Tr. at 51;
see also Tr. at 86-87). In addition, Ms. Nickens-Thomas
testified that Patricia Davis said she knew the defendant by the
name "BI." (Tr. at 132).

detective squad to prepare to go to the location specified by the
tipster, which was 3540 Decatur Avenue, Apartment 3K.  (Tr. at
23; DX B).  Sergeant O'Rourke instructed everyone to wear bullet-
proof vests to the scene, and within approximately two or three
minutes, Detective Rosado, Sergeant O'Rourke, and the other
responding officers left the precinct and traveled to 3540
Decatur Avenue in unmarked police vehicles.  (Tr. at 23).  When
they reached the block on which the building was located,
Detective Rosado got out and made eye contact with a man who was
standing on the street with a dog.  (Tr. at 24).  The man nodded
his head up and down, indicating to Detective Rosado that the
police were focused on the correct building.  (Tr. at 24).

13.  Once Detective Rosado and the other officers entered
the building, they stationed themselves outside of Apartment 3K
and called for uniformed back-up.  (Tr. at 24, 26).  Detective
Rosado specifically requested that the responding officers not
use their lights or sirens so that the neighborhood would not be
alerted to their presence.  (Tr. at 25).[5]  When the uniformed

5    Although the request for back-up did not specify why
additional officers were needed at the scene, Officer Matos
testified that he believed they were called there in connection
with the defendant, about whom he had learned from a briefing at
the start of his shift that day.  (Tr. at 95).  He based this
belief on the fact that Detective Rosado, who was in charge of
looking for the defendant, was present at the scene.  (Tr. at
95).

officers arrived, Detective Rosado and another detective knocked
on the door to the apartment, and a female voice asked who was
there.  (Tr. at 26).  Detective Rosado said, "Police," and the
woman opened the door.  (Tr. at 26).  Using a low voice,
Detective Rosado identified himself and asked whether he and the
other officers could come in.  (Tr. at 26, 28, 96).  Detective
Rosado testified that the woman then said yes, and stepped to the
side.  (Tr. at 26, 56).[6]

14.  Detective Rosado and at least two of the other
detectives entered the apartment at that point.  (Tr. at 26).
Detective Rosado asked the woman whether there was anyone else in
the apartment, and she provided a name, but it was not the
defendant's name.  (Tr. at 26).  Detective Rosado then showed the
woman a photograph of the defendant, and she said, "Yes, he's in
the back room."  (Tr. at 26, 56).  Detective Rosado then turned
to the other officers and said, "He's in the back room, guys."

---

[6]    Both Detective Rosado and Officer Matos testified that the
woman did not appear to be upset when the officers entered the
apartment, and Officer Matos further testified that the woman did
not attempt to stop him or any of the other officers from
entering.  (Tr. at 28, 97).  Although Ms. Nickens-Thomas
testified that Ms. Davis told her the police never asked her for
permission to enter (Tr. at 134), for the reasons stated in
paragraph 4, supra, the Court should not credit Ms. Davis'
hearsay statement.

(Tr. at 28).[7]

15.  At that point, Detective Rosado drew his gun and started walking towards the back room of the apartment.  (Tr. at 26, 28.)  Officer Matos and Sergeant O'Rourke also drew their guns as they entered the apartment.  (Tr. at 97, 122).  Detective Rosado testified that, as he entered the hallway leading to the bedroom, he saw the defendant walking slowly from one end of the bedroom to the other, where the bed was located, passing in front of the open doorway to the bedroom as he did so.  (Tr. at 27, 31, 33).[8]  Detective Rosado began yelling at the defendant to stay still and put his hands up.  (Tr. at 27, 65).  The defendant stopped moving, and either looked in the direction of the bed or made a movement towards the direction of the bed.  (Tr. at 27 (Detective Rosado: "He looked at me, and he looked straight

---

[7]    Officer Matos testified that after he crossed the threshold of the apartment, he heard someone in the hallway say, "He's in the bedroom."  (Tr. at 98).  The slight difference in recollection between Detective Rosado and Officer Matos is inconsequential because the officers agree that they were informed at some point shortly upon entering the apartment that the defendant was in the back room, and they proceeded down the hallway to locate him.

[8]    In his declaration submitted in support of his motion, the defendant stated that he was standing in the hallway when the police entered the apartment, and only backed into the bedroom as they approached him.  (Peels Decl. ¶¶ 4-5).  This statement was contradicted by the testimony of all three police officers, who agreed that the defendant was in the bedroom at the time they first saw him.  (Tr. at 33 (Detective Rosado), 98 (Officer Matos), 129 (Sergeant O'Rourke)).

11

ahead" while facing in the direction of the bed); 99 (Officer

Matos: "He was standing still, but he had made a motion to his

left side" towards the bed)).  As the defendant began to put his

hands up, Detectives Flores and Murphy passed Detective Rosado

and entered the bedroom in order to restrain the defendant.  (Tr.

at 27, 65, 99).[9]  Detective Rosado then holstered his gun and

walked into the bedroom in order to talk to the defendant, who

was standing near the foot of the bed.  (Tr. at 27, 67, 102).[10]

Following Detective Rosado into the bedroom were Sergeant

O'Rourke, Officer Matos, and possibly Detective Mercado-Gomez.

(Tr. at 81, 100).  Shortly after the defendant was restrained,

---

[9]    It was unclear from the testimony elicited at the hearing
precisely when the defendant was placed in handcuffs.  Detective
Rosado testified at one point that he was "pretty sure" the
defendant was not handcuffed when he was led from the bedroom to
the living room (Tr. at 71), but Officer Matos testified that the
defendant was placed in handcuffs at the same time that he
noticed the sock on the bed, which contained the gun (Tr. at 102,
112), and Sergeant O'Rourke testified that the defendant was
placed in handcuffs before being escorted out of the bedroom (Tr.
at 124).  For the reasons discussed in paragraphs 42 and 43,
infra, these differences in recollection are of no real
consequence because, regardless of when the defendant was
handcuffed, the seizure of the gun was lawful.

[10]    Detective Rosado testified that, at this point, the
defendant was within arms' reach of the bed.  (See Tr. at 67 (if
the defendant had attempted to do a push-up from where he was
standing when he was approached by the officers, the defendant
"would have leaned over and put hi[s] arms on the bed.").
Officer Matos and Sergeant O'Rourke also testified that the
defendant was standing at the foot of the bed when he was
restrained.  (Tr. at 112; DX W and DX X).

Detectives Flores and Murphy led him out of the bedroom.  (Tr. at 30).

### C.   **The Recovery of the Gun**

16.   Officer Matos testified that, as soon as he entered the bedroom, he checked the area to his right, because the defendant had made a motion in that direction.  (Tr. at 100).  On the right side of the bed, near the head, Officer Matos saw a sock sitting between the single mattress and the wooden frame of the bed. (Tr. at 100, 101, 116).  Sergeant O'Rourke saw the sock in the same location.  (Tr. at 127; <u>see</u> DX W (Officer Matos' diagram of gun location) and DX X (Sergeant O'Rourke's diagram of sock location)).  Officer Matos testified that what drew his attention to the sock was the unusual "curvature" or "U shape" of an object inside it.  (Tr. at 102).  He specifically stated that the sock appeared to have a hard metallic object inside with a curved edge that looked like the back of the handle of a gun.  (Tr. at 100, 102, 103).  Officer Matos further testified that there was nothing obstructing his view of the sock, and from the moment he saw it, he thought that the object inside might be a gun because of the way the outline of the shape of the gun was visible against the stretched fabric of the sock.  (Tr. at 104, 116).  He proceeded to touch the sock and squeeze it, and he felt a hard object inside, which felt like a pistol.  (Tr. at 102).  He then

13

picked up the sock (without having to move anything to access it), looked inside it, and saw a pistol. (Tr. at 102, 117). Officer Matos secured the gun and put it in his pocket for safekeeping. (Tr. at 105).[11]

17.  After the defendant was led out into the living room, the officers dressed him and put shoes on him. (Tr. at 34). The defendant was then led out of the apartment, down the elevator, and outside the building, where he was placed in a van to be transported to the 52nd Precinct. (Tr. at 35).

18.  Detective Rosado and Officer Matos, along with their partners, then went to the victim's apartment, which was located "around the corner," to show her the gun that was recovered from the bedroom. (Tr. at 36, 106). Officer Matos rolled down the sock so that the victim could look at the gun, and she was able to positively identify it as the same gun that was used to assault her. (Tr. at 36-37, 107).

---

[11]   Sergeant O'Rourke testified that he saw the sock, directed Officer Matos' attention to it, and that Officer Matos then picked up the sock, indicating that Sergeant O'Rourke did not tell him it held a gun. (Tr. at 127-28). This testimony is not inconsistent with Officer Matos' testimony that when he entered the bedroom, he looked in the direction of the bed and, as soon as he saw the sock, he thought that it might contain a gun.

## PROPOSED CONCLUSIONS OF LAW

**A.    The Police Obtained Consent to Enter the Apartment**

19.   The testimony of Detective Rosado, as supported by the testimony of Officer Matos and Sergeant O'Rourke, demonstrated that the police obtained consent to enter Ms. Davis' apartment. Even if the Court finds that Ms. Davis did not explicitly tell the officers they could enter the apartment, the officers' testimony regarding her actions and conduct demonstrate her consent.

20.   While the warrantless search of a residence is generally unreasonable, "an individual may consent to a search, thereby rendering it reasonable." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995). "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973)). Consent is valid if it is given voluntarily and is not the product of duress or coercion, evaluated in light of the totality of the surrounding circumstances. See Schneckloth, 412 U.S. at 227; United States v. Kon Yu-Leung, 910 F.2d 33, 41 (2d Cir. 1990). "The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker, and is a question of fact to be determined from all of the surrounding

15

circumstances." <u>United States</u> v. <u>Arango-Correa</u>, 851 F.2d 54, 57 (2d Cir. 1988) (citation omitted).

21.   "[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct." <u>United States</u> v. <u>Buettner-Janusch</u>, 646 F.2d 759, 764 (2d Cir. 1981).  Accordingly, "a search may be lawful even if the person giving consent does not recite the talismatic phrase: 'You have my permission to search.'"  <u>Id</u>.; <u>see</u> <u>United States</u> v. <u>Camilo</u>, 287 F. Supp. 2d 446, 451 (S.D.N.Y. 2003) ("valid consent need not be expressed through any particular phrase, and it 'can be found from an individual's words, acts or conduct'") (citation omitted).

22.   At the hearing, Detective Rosado credibly testified that he asked Ms. Davis for permission to enter her apartment, and she consented.  (Tr. at 26).  Detective Rosado stated that he did not have his weapon drawn while he was speaking to Ms. Davis (Tr. at 28), and there is no credible evidence that any of the other officers had their weapons drawn at that time.[12]   Thus,

---

[12]   The defendant's statement in his declaration that the officers "barged into the apartment with guns drawn" (Peels Decl. ¶ 4), is not credible, nor is it supported by any of the evidence.  Even assuming <u>arguendo</u> that the defendant was standing in the hallway outside the back room when the officers entered the apartment as he claims in his declaration (which claim was contradicted by all three police officers), he would not have had a clear line of sight to the entry of the apartment and therefore would not have been able to see whether the officers had their guns drawn until they headed down the hallway towards him.  (<u>See</u>

there is no evidence that Ms. Davis' verbal consent was
involuntary or coerced.  Rather, the testimony at the hearing
demonstrated that Detective Rosado dealt with Ms. Davis in a
"courteous" and "non-coercive manner" without "duress or show of
force," and that his questioning of her was brief.  <u>United States</u>
v. <u>Diaz</u>, No. 96-1785, 210 F.3d 356 (Table), 2000 WL 357680, at *2
(2d Cir. Apr. 5, 2000) (10-15 minutes of noncoercive courteous
questioning supported finding that consent was voluntary; <u>see</u>
<u>also</u> <u>United States</u> v. <u>Calvente</u>, 722 F.2d 1019, 1023 (2d Cir.
1983) (calm conversation and conversational tenor of discussion
lend support to consensual entry).  For these reasons, the Court
should credit Detective Rosado's testimony that Ms. Davis
provided verbal consent for the officers to enter the apartment.

23.  In addition, the consistent testimony of Detective
Rosado and Officer Matos regarding Ms. Davis' demeanor and
conduct during the period when the officers were present in the
apartment demonstrated that, even if Ms. Davis did not give
explicit verbal consent, her actions indicated her implied
consent to the officers' entry into her apartment.  (<u>See</u> Tr. at
28, 97).  There was no evidence presented at the hearing that Ms.
Davis took any action to prevent the officers from entering, or

---

DX P (floor plan)).

that she was upset or distraught about their entry.

24. Detective Rosado testified that Ms. Davis opened the door and stepped aside to let the officers enter the apartment. (Tr. at 26). She then told the officers that the defendant was in the back room (the bedroom) of the apartment (Tr. at 26), where they in fact found him. Such "affirmative acts of cooperation" demonstrate that Ms. Davis impliedly consented to the officers' entry. United States v. Rosi, 27 F.3d 409, 412-13 (9th Cir. 1994) (implied consent to enter where agents suggested to renter that they go inside condo and renter did not answer but followed agents into condo without objection); United States v. Garcia, 997 F.2d 1273, 1281 (9th Cir. 1993) (consent to enter implied where officers asked to talk to defendant, defendant nodded and said ok, and defendant stepped back thereby clearing way for officers to enter).

25. In United States v. Goncalves, No. 5:07-CR-257 (NAM), 2008 WL 2080550 (N.D.N.Y. May 15, 2008), the court found that the owner of a residence impliedly and voluntarily consented to the officers' entry for the purpose of locating the defendant when, in response to the officers' inquiry as to where the defendant was, she stated that he was inside, turned around, and entered the house without any further explanation or instruction, and left the doors open behind her. Id. at *8. The court also

18

relied on the fact that the woman "acted cooperatively and did nothing to stop [the officers] from following her or to indicate that she did not intend for them to follow her" inside the house. Id.

26.  Here, as in Goncalves, Ms. Davis consented to the officers' entry into her apartment by opening the door, allowing them to step inside to ask further questions, and informing the officers that the defendant was in the back room of the apartment.

**B.    The Entry to the Apartment Was Also Justified by Exigent Circumstances**

27.  Exigent circumstances allow the police to enter a residence without a search warrant.  See United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990).  "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." Id. (citation omitted).  "[T]he test for determining whether a warrantless entry is justified by exigent circumstances is an objective one," assessed under the totality of the circumstances. United States v. Medina, 944 F.2d 60, 68 (2d Cir. 1991) (quoting MacDonald, 916 F.2d at 769).

28.  In considering whether exigent circumstances exist to

19

justify the warrantless entry into an apartment, courts should

consider the following factors:

> (1) the gravity or violent nature of the
> offense with which the suspect is to be
> charged; (2) whether the suspect is
> reasonably believed to be armed; (3) a
> clear showing of probable cause . . . to
> believe that the suspect committed the
> crime; (4) strong reason to believe that
> the suspect is in the premises being
> entered; (5) a likelihood that the
> suspect will escape if not swiftly
> apprehended; and (6) the peaceful
> circumstances of the entry.

Medina, 944 F.2d at 68 (quoting MacDonald, 916 F.2d at 769-70

(internal quotation marks omitted); accord Loria v. Gorman, 306

F.3d 1271, 1284 (2d Cir. 2002). These factors are not an

"'exhaustive canon, but . . . an illustrative sampling of the

kinds of facts to be taken into account.'" Loria, 306 F.3d at

1284 (quoting MacDonald, 916 F.2d at 770). "Thus, the presence

or absence of any single factor is not dispositive." Id.

29. Other factors that constitute exigent circumstances

justifying the warrantless entry of a home include the need to

prevent the destruction or moving of evidence, see, e.g., United

States v. Miles, 889 F.2d, 382, 383 (2d Cir. 1989); Medina, 944

F.2d at 69, and the risk of danger to the police or other persons

inside or outside the dwelling, Warden v. Hayden, 387 U.S. 294,

298-99 (1967); United States v. Thomas, 372 F.3d 1173, 1177-78

(10th Cir. 2004); <u>United States</u> v. <u>Lenoir</u>, 318 F.3d 725, 730-31 (7th Cir. 2003).

30.  The testimony presented at the hearing demonstrated that the officers' entry into Ms. Davis' apartment was justified because all of the six standard factors that bear on the question of exigency were met in this case.  See <u>Medina</u>, 944 F.2d at 68.

31.  First, "the gravity and violent nature of the offense," <u>Medina</u>, 944 F.2d at 68, with which the defendant was to be charged in this case -- that is, the assault of his girlfriend with a gun on September 26, 2007 (Tr. at 8; DX B), just three days prior to his arrest -- clearly supports a finding of exigent circumstances.

32.  Second, the defendant was "reasonably believed to be armed," <u>Medina</u>, 944 F.2d at 68, because he was suspected of a recent crime involving the use of a gun, which had not yet been recovered.  (Tr. at 8).  Moreover, the defendant had made verbal threats to Detective Rosado over the phone which indicated that he might be armed and prepared to use deadly force.  (Tr. at 18).

33.  Third, there was "a clear showing of probable cause . . . to believe that the suspect committed the crime," <u>Medina</u>, 944 F.2d at 68, in this case, the pistol-whipping of his girlfriend.  Detective Rosado spoke to the victim herself about the circumstances of the assault, and had previously arrested the

21

defendant for committing an assault against the same victim.
(Tr. at 10, 14).

34.    Fourth, the officers had a "strong reason to believe
that the suspect [was] in the premises being entered." Medina,
944 F.2d at 68.  Shortly before the defendant's arrest took
place, Detective Rosado received two phone calls with specific
details regarding the defendant's whereabouts.  During the first
call, the tipster informed Detective Rosado that the defendant
was staying in Apartment 3K of the last building on Decatur
Avenue on the right-hand side, and agreed to stand in front to
signal to Detective Rosado that the police were focused on the
right building.  (Tr. at 22).  During the second call, which
occurred a few minutes later, the same tipster provided Detective
Rosado with the number of the building.  (Tr. at 23).  In
addition, the building was close to where the victim and the
defendant's mother lived (see Tr. at 36), and near two other
locations on Gun Hill Road and Decatur Avenue where Detective
Rosado had been informed the defendant might be staying (Tr. at
12).

35.    Fifth, had the defendant been alerted to the presence
of the officers in the building, there is a reasonable
probability that he would have attempted to flee.  Medina, 944
F.2d at 68.  The defendant had already been on the run from the

22

police for three days, and was obviously trying to avoid being apprehended.

36.  Sixth, the testimony of the officers demonstrated that the circumstances of the officers entry into the apartment were "peaceful." Medina, 944 F.2d at 68.  When Detective Rosado knocked on the door, Ms. Davis opened it, and the officers gained entry to the apartment.  (Tr. at 26).  There was no evidence at the hearing that the officers kicked or forced the door open, or that they used any other threatening means to gain entry.

37.  In addition to the six factors outlined above, there was a real risk of danger to any police officers who might encounter the defendant or, indeed, any person who might provoke him in some way, given the defendant's statements to Detective Rosado that he was not going to surrender willingly to the police and that "whoever comes after me, you're going to have to kill me or I'm going to kill you guys" (Tr. at 18), the violent assault for which he was wanted, and the fact that he was a suspect in a recent shooting incident.  Thus, the officers were justified in entering the apartment without first seeking a warrant.  See Warden v. Hayden, 387 U.S. 294, 298-99 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others.").

23

38.  In sum, all of these circumstances supported the warrantless entry of the apartment by the officers.

### C.  __The Gun Was Seized Incident to the Defendant's Lawful Arrest__

39.  When arresting a person inside a residence, there are two kinds of warrantless searches that the Supreme Court has found permissible.  First, "as a precautionary matter and without probable cause or reasonable suspicion, [the police may] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Maryland v. Buie, 494 U.S. 325, 334 (1990).  Second, where there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing" that there is within the home, "an individual posing a danger to those on the arrest scene," the officers may conduct a protective sweep of the home looking wherever such a person might be hiding.  Id. at 334, 335.

40.  As the Second Circuit has clarified, this means that "if an officer reasonably concludes that an individual poses a danger to those at the scene of the arrest, the threat of physical harm may be neutralized by a quick search for weapons within the reach of that individual."  United States v. Blue, 78 F.3d 56, 59 (2d Cir. 1996) (citing United States v. Hernandez,

24

941 F.2d 133, 137 (2d Cir. 1991)).  Thus, the scope of a search

incident to a lawful arrest is not limited to the suspect's

person, but may also include the area within the suspect's

"immediate control," that is, "the area from within which [the

suspect] might gain possession of a weapon or destructible

evidence."  Chimel v. California, 395 U.S. 752, 763 (1969);

Hernandez, 941 F.2d at 137 (protective search may include search

"for weapons within the grab area of an individual whom the

government agents have reasonably concluded is dangerous").

    41.  In United States v. Hernandez, 941 F.2d 133 (2d Cir.

1991), for example, the Second Circuit upheld the district

court's ruling that the protective search of the "grab area"

around one of the arrestees, including a check of the mattress of

the bed in the room where the arrest took place, was entirely

proper.  Id. at 137.  The court so held even though the arrestee

had already been placed in handcuffs, relying on the district

court's conclusion that, "'[i]f [the arrestee] were left

unattended even for a short period of time and knew where the gun

was, it would not be an impossible task even for one handcuffed

from behind to work her hands between the mattress and the box

spring and grab the weapon.'"  Id.

    42.  In this case, the evidence at the hearing demonstrated

that the officers were clearly justified in conducting a limited

protective search of the area within the defendant's grab area. First, the officers reasonably believed that the defendant posed a threat of physical harm to those present at the scene. The defendant had made specific remarks to Detective Rosado indicating his willingness to harm any police officers who apprehended him (Tr. at 18), he was believed to be armed because he was wanted in connection with an assault with a gun (Tr. at 8), and he was an intimidating physical presence (see Tr. at 124 (Sergeant O'Rourke: defendant is a "big guy," requiring two sets of handcuffs).

43. Second, all three officers testified that the defendant was standing inside the bedroom at the foot of the bed when they entered the room. (Tr. at 67, 112; DX W and DX X). Therefore, the sock holding the gun, which was found on the right side at the head of the bed (see DX W and DX X), was clearly within his reach. Moreover, given that the sock was sitting between the side of the mattress and the bedframe without any obstruction blocking access to it (Tr. at 116-17), there was a real possibility, as in Hernandez, that the defendant could have grabbed the gun and used it to harm the officers, even if his hands were restrained in handcuffs.

   **D.    The Gun Was In Plain View**

44. Police officers, when lawfully in a particular location

26

within a residence, may seize evidence found in plain view.  <u>See</u>
<u>Horton</u> v. <u>California</u>, 496 U.S. 128, 133, 135-36 (1990).  A
warrantless seizure is justified under the plain view doctrine if
the officer has a legal right to be in the place from where he
sees the object subject to seizure and a "lawful right of access
to the object itself," and if the object's incriminating nature
is "immediately apparent."  <u>Id.</u> at 136-37; <u>see also</u> <u>United States</u>
v. <u>Gori</u>, 230 F.3d 44, 50 (2d Cir. 2000) (warrant not required to
seize "an item in plain view if there is cause to believe that it
is evidence of crime").

45.  Moreover, any item whose incriminating character is
immediately apparent and that is seen by the agents and officers
during their protective sweep of a residence can be seized
without a warrant.  <u>See</u> <u>United States</u> v. <u>Kiyuyung</u>, 171 F.3d 78,
83 (2d Cir. 1999) ("Patently incriminating evidence that is in
plain view during a proper security check may be seized without a
warrant."); <u>Medina</u>, 944 F.2d at 69 (during protective sweep
inside apartment, agents properly seized pistol lying in a
partially opened gun case in bedroom because it was in plain
view); <u>United States</u> v. <u>Jackson</u>, 778 F.2d 933, 937 (2d Cir. 1985)
(objects coming into plain view during a security check can be
properly seized); <u>United States</u> v. <u>Gomez</u>, 633 F.2d 999, 1008 (2d
Cir. 1980) (same).

46.   Both Officer Matos and Sergeant O'Rourke testified that the sock which held the gun was lodged between the side of the bedframe and the mattress, in plain view.  (Tr. at 116, 127). Officer Matos specifically testified that he did not have to move anything to see the sock or to pick it up.  (Tr. at 116-17).  In addition, Officer Matos testified in detail about the appearance of the gun inside the sock, explaining how the shape of the hard metallic object looked like the back of the handle of a gun. (Tr. at 102-04).  Based on Officer Matos' testimony, it is clear that the incriminating nature of the gun was immediately apparent.

**CONCLUSION**

47.   On the proposed findings of fact and conclusions of law set forth above, the defendant's motion to suppress should be denied in all respects.

Dated:    New York, New York
          August 11, 2008


                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney
                         Southern District of New York


                   By:   ___/S/_____
                         AMY LESTER
                         Assistant United States Attorney
                         Telephone: (212) 637-2416

28

<u>CERTIFICATE OF SERVICE</u>

AMY LESTER deposes and says that she is employed in the Office of the United States Attorney for the Southern District of New York.

That on August 11, 2008, she caused to be served a copy of the foregoing Government's Proposed Findings of Fact and Conclusions of Law in Further Response to Defendant's Motion to Suppress by hand on:

> Martin S. Cohen, Esq.
> Attorney for Defendant Eric Peels
> Federal Defenders of New York
> 52 Duane Street, 10th Floor
> New York, New York 10007

I declare under penalty of perjury that the foregoing is true and correct.  Title 28, United States Code, Section 1746.

_/S/_____

AMY LESTER

Executed on: August 11, 2008
             New York, New York