UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------X
                       :

UNITED STATES OF AMERICA   :         **08 CR. 036 (JGK)**
                       :

      - v. -         :
                       :

**Eric Peels,**            :
                       :

          Defendant.   :
--------------------------------------------X

**DEFENDANT ERIC PEELS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW**


LEONARD F. JOY, ESQ.
Federal Defenders of New York, Inc.
Attorney for Defendant
**Eric Peels**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8737


**MARTIN S. COHEN**
Of Counsel


TO:  **MICHAEL J. GARCIA, ESQ**.
     United States Attorney
     Southern District of New York
     One. St. Andrew's Plaza
     New York, New York 10007
     Attn: **AMY LESTER, ESQ.**
               Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X
                              :

UNITED STATES OF AMERICA  :          **08 CR. 036 (JGK)**

       - v. -          :

                               :

**Eric Peels,**                 :

                               :

          Defendant.     :
---------------------------------------------X

## DEFENDANT ERIC PEELS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### PRELIMINARY STATEMENT

The Government has failed to meet its burden of proving by a preponderance of the evidence that the warrantless entry into and search of the apartment where Eric Peels was staying on September 29, 2007, was lawfully conducted.

*No Valid Consent To Enter*: When Patricia Davis, a tenant in the apartment where Mr. Peels was staying, opened the door in response to the knocking by the police, she was confronted with four or five detectives standing in her doorway wearing bullet-proof vests, and at least four uniformed officers spread out down the hallway. Such a show of authority is inherently coercive, and the police took no steps to reduce this coercive pressure when seeking entry to the apartment. To the extent that Ms. Davis's actions – for example, not trying to prevent the police from entering the apartment – could be viewed as implied consent, the Government has not established, as it must, that this consent was voluntarily given, and that it was a "free and unconstrained choice" rather than "mere acquiescence in a show of authority." United States v.

Wilson, 11 F.3d, 346, 351 (2d Cir. 1993). Moreover, Ms. Davis told the Government's investigator that the police never requested, nor did she provide, consent to enter the apartment.

*No Valid Consent To Search Within the Apartment for Mr. Peels*: Even were the Court to find valid consent to enter, the scope of that consent is reasonably limited solely to entrance, and would not extend to the search within the apartment for the purpose of arresting Mr. Peels. The police never asked for such consent, and the Government has failed to establish that Ms. Davis provided it. Even were the Court to credit Rosado's testimony concerning his conversation with Ms. Davis once inside the apartment, it does not establish that Rosado, or any other officer, was granted consent to search within the apartment. Rosado testified only that once inside the apartment, he asked Ms. Davis whether anyone was staying in the apartment with her. Ms. Davis responded with a name that Rosado was unfamiliar with, at which point he took out an old photograph of Mr. Peels and showed it to Ms. Davis. After looking at the photograph, Ms. Davis said, "he's in the back room," at which point Rosado drew his gun and started walking further into the apartment.

To the extent that "he's in the back room," could be construed as consent, the Government has failed to establish that such consent was voluntarily given. First, it is not at all clear that Ms. Davis connected the picture of Mr. Peels shown to her by Rosado with the person in her apartment, whom she knew by another name. Second, Ms. Davis's statement was made with at least two officers – and probably more – standing inside the apartment, at least one of whom – and probably more – with his gun drawn, and with other officers spilling out of the doorway and into the hall. Under the totality of these circumstances, the Government has not established that any "consent" provided by Ms. Davis was voluntary.

3

Assuming, *arguendo*, that the police lawfully entered the bedroom of the apartment for the purpose of arresting Mr. Peels, the Government has failed to establish that the search for and seizure of the gun was constitutional:

*No Consent To Search the Bedroom*: The police did not request, nor receive, consent to search the bedroom from either Ms. Davis or Mr. Peels.

*No Protective Search*: The Government failed to establish that the seized gun was within Mr. Peels immediate control at the time it was seized. Indeed, by the time Officer Matos picked up the sock, Mr. Peels was no longer in the bedroom. (Officer Matos contends otherwise, but his testimony is in conflict with that of Sergeant O'Rourke and Detective Rosado on this point. For reasons set forth below, it is more credible that Mr. Peels was no longer in the room at the time the gun was found.) But even if Mr. Peels had been in the room when the gun was found, there was *no testimony* from any of the witnesses that the sock was within Mr. Peels' immediate control from the moment the police entered the bedroom, and certainly not at the moment when the gun was discovered. The officers' consistent testimony is that once the officers entered the bedroom, Mr. Peels did not attempt to move from where he was standing below the foot of the bed, and that: (1) he placed his hands behind his back to assist the officers; (2) each of his arms was held by a detective; and (3) other officers stood between Mr. Peels and the bed until he was escorted out of the room. Both Officer Matos and Sergeant O'Rourke testified that while Mr. Peels was restrained below the *foot* of the bed, the sock was lodged between the mattress and bed frame by the *head* of the bed. Because the gun was not within Mr. Peels' immediate control, its seizure cannot be justified under the protective sweep doctrine.

4

*The Gun Was Not In Plain View*: The Government also has failed to establish, as it must under the "Plain View" doctrine, that the incriminating character of the sock was immediately apparent. First, the Government elicited no testimony from Sergeant O'Rourke, who first saw the sock and called it to Officer Matos's attention, concerning the sock's character. Second, Officer Matos, who discovered the gun, did not realize that the sock contained a gun until *after* he picked it up and looked inside. If a six-year veteran who has participated in over 70 gun arrests could not determine from looking at the sock that it contained a gun, the incriminating nature of the sock was immediately apparent.

For these reasons, the Government has not met its burden of proving by a preponderance of the evidence that the search for and seizure of the gun was lawfully conducted, and accordingly the Fourth Amendment requires that the gun be suppressed.

## PROPOSED FINDINGS OF FACT

**I.    The Hearing Testimony and Exhibits**

On July 31, 2008, an evidentiary hearing was conducted in which the following witnesses testified: Detective Frankie Rosado, the arresting officer; Police Officer Eduardo Matos; Detective-Sergeant Michael O'Rourke, the supervising officer; and Sheila Nickens-Thomas, an investigator for the United States Attorney's Office. Rosado, Matos and O'Rourke are officers with the New York Police Department, assigned to the 52nd Precinct in the Bronx. These officers, among others, were present during the arrest of Eric Peels at 3540 Decatur Avenue, apartment 3K, in the Bronx (the "Decatur Apartment") on the afternoon of September 29, 2007. About five months after the arrest of Mr. Peels, Ms. Nickens-Thomas interviewed Patricia Davis, the tenant in the Decatur Apartment who answered the door when the police arrived. In addition

to these witnesses, Mr. Peels submitted a declaration setting forth his recollection of the circumstances surrounding his arrest.

The layout of the Decatur Apartment is as follows: the front door opens into a living room. On the right side of the living room is a hallway that leads to the back room, where Mr. Peels was arrested. (In their testimony, the witnesses used "bedroom" and "back room" were synonymously.)

### A.   Detective Frankie Rosado

#### 1.   *The Search for Mr. Peels*

Detective Rosado testified as follows: On September 28, 2007, a colleague in the 52nd Precinct detective squad asked him to take over the search for Peels, who was wanted for allegedly having assaulted his girlfriend with a gun. (Tr. at 7-8.)   Rosado was familiar with Peels because he had previously arrested him for a misdemeanor assault in late 2006. (Tr. at 8.)

On the morning of September 29, Rosado and two other officers went in search of Peels. (Tr. at 11-12, 41.) The officers first went to the apartment of Mr. Peels' girlfriend, Ms. Halstead. (Tr. at 12.) Mr. Peels' mother was staying there, and the women asked the police to check the mother's apartment, which was upstairs in the same building, to see if Mr. Peels was staying there. (Id.) He was not. (Id.) Nevertheless, the officers conducted a thorough search of the apartment, looking in closets and under at least one mattress. (Tr. at 12, 41.) The officers next went to an apartment on Gun Hill Road where a friend of Mr. Peels lived. (Tr. at 12.) Mr. Peels' friend consented to the police searching her apartment, but Mr. Peels was not there either. (Tr. at 12-13.) The officers then went to a third apartment on Decatur Avenue (in a different building from where the arrest took place). (Tr. at 13.) The police asked the super of this building

6

whether there were any apartments used for "you know, hanging out, smoking drugs, crack and stuff like that?" (Id.) The super provided an apartment number on the sixth floor. (Id.) The police knocked on the door, but no one responded. (Id.)

Later that morning, Rosado was told that a police patrol had responded to a call from Ms. Halstead's apartment, and that the ESU unit (Emergency Service Unit) was again searching Mr. Peels' mother's apartment. (Id.) Detective Rosado and his colleagues returned to the building. (Id.) By the time they arrived, ESU had "cleared" the apartment, retrieving a bullet-proof vest that was found during the search. (Id.)

Upon returning to the precinct, Rosado received a call from Mr. Peels. (Tr. at 17.) Rosado urged Mr. Peels to turn himself in. (Tr. at 17-18.) Mr. Peels refused, saying, among other things, "Oh, whoever comes here, Rosado, whoever comes after me, you're going to have to kill me or I'm going to kill you guys. I'm not coming in." (Tr. at 18.)

At approximately 4:50 p.m., Rosado received a call from a detective monitoring the Crimestoppers tip line, who said that a tipster had called, and the tipster had stated that "the police had been in the neighborhood looking for BI and he knew where BI was hiding out." (Tr. at 21.; Def. Ex. B, Complaint Follow-Up Report.) The tipster then called Rosado directly. (Tr. at 22, 46; Def. Ex. B.) The tipster, who refused to give his name (Tr. at 22, 49), told Rosado that "BI was hiding out in Apartment 3K of 3540 Decatur Avenue." (Def. Ex. B.) Rosado did not know that BI was a nickname for Mr. Peels. (Tr. at 52.) He assumed that the tipster was referring to Mr. Peels because that was the person Rosado and his colleagues had been looking for that morning. (Tr. at 51-52.) Rosado arranged a signal with the tipster: the tipster was to

stand in front of the building where he believed BI was staying, and would touch his head when the officers arrived in front of the building. (Tr. at 22.)

Rosado and his colleagues "suited up" (that is, they put on bullet-proof vests), and drove to 3540 Decatur Avenue. (Tr. at 23.) Upon arriving, Rosado saw an older guy walking his little dog. (Tr. at 24.) Rosado made eye contact with the guy, who shook his head up and down, and then walked away. (Tr. at 24.) The guy did not touch his head, and Rosado never spoke to him. (Tr. at 52, 50.)

2.    *Entering the Apartment*

When Rosado arrived at 3540 Decatur Avenue, he, along with four other officers from the 52nd Squad – Detective-Sergeant O'Rourke, and Detectives Murphy, Flores, and Mercado-Gomez – went up to the third floor of 3540 Decatur Avenue. (Tr. at 25, 53.) Rosado then called for uniformed back-up, and the detectives were joined by Officer Matos and his partner. (Tr. at 25.) Once the uniformed personnel arrived, with the officers "congested" right by the door, Rosado started knocking at the door. (Tr. at 26.) At the same time, another detective was "banging on the door." (Id.) A female voice from inside of the apartment asked who it was, and Rosado yelled out, "Police!" (Id.) A lady – later identified as Patricia Davis – opened the door. (Id.) Rosado, speaking in a low voice, said: "Ma'am, I'm Detective Rosado, I work in the 52nd Precinct, can we come in?" (Id.) "Yes," replied Ms. Davis," "come on in." (Id.) Rosado did not have his gun drawn when Ms. Davis answered, but he does not recall whether any of the other officers had their guns drawn. (Tr. at 53.)

Ms. Davis stepped to the side, and Rosado and another detective stepped into the apartment. (Tr. at 26.) Rosado asked, "Ma'am, anyone else in this apartment besides you?" (Tr.

7

at 26.) Ms. Davis responded with a name that Rosado did not recognize at the time, and did not

remember at the hearing. Rosado then showed Ms. Davis an old photograph of Mr. Peels taken

when Mr. Peels had long hair and braids. (Tr. at 26, 60; Def. Ex. D, "Mugshot Pedigree" of Eric

Peels.) On the day Mr. Peels was arrested, he had short hair. (Tr. at 61; Ex. R, photograph of

Mr. Peels taken on day of the arrest.) As to whether any of the officers had their guns drawn

while Rosado spoke with Ms. Davis, Rosado did not know. (Tr. at 57.) He was focused on Ms.

Davis, and not on the other officers, who were standing either behind or next to him. (Tr. at 56-

57.)

"Is this him?" asked Rosado. (Tr. at 29.) Ms. Davis looked at the photo and said, "Yes,

he's in the back room." (Id.)

3.    *Arresting Mr. Peels and Finding the Gun*

As soon as Rosado heard Ms. Davis say that "he" was in the back room, he tucked the

photo of Mr. Peels away in his pocket, pulled his gun out, and started walking towards the back

room: "It's a little kind of a long hallway, and I started walking slowly." (Tr. at 26-27.) Through

the open doorway of the back room, Rosado saw Mr. Peels:

> He was in the back room. The door was open, so you could see him,
> he was standing, like, walking to the side and I started yelling at him.
> I said, "Listen." I started kind of cursing. "Don't move, let me see
> your hands, let me see your hands." He looked at me, and he looked
> straight ahead, and he looked at me again and I kept yelling at him,
> Don't move, don't move." And then he put his hands up.

(Tr. at 27.)

Detectives Flores and Murphy walked around Rosado, who had stopped at the end of the

hallway with his gun pointed at Mr. Peels, and each detective grabbed one of Mr. Peels arms.

(Id.) Mr. Peels, who was wearing only boxer shorts, didn't say anything. (Tr. at 27, 34.) Indeed,

8

Rosado thought Mr. Peels looked a little relieved at being arrested. (Tr. at 27.) After Flores and Murphy grabbed Mr. Peels, Rosado told Mr. Peels, "'Listen, don't say nothing, relax. We'll talk when we get back.'" (Tr. at 30.) Detectives Flores and Murphy then escorted Mr. Peels out of the backroom and into the living room. (Tr. at 30, 67.)

Rosado remained in the back room with Sergeant O'Rourke, Officer Matos, Detective Mercado-Gomez, and perhaps other police officers. (Tr. at 81.) At some point after Mr. Peels had been escorted out of the room, Rosado looked at Sergeant O'Rourke, who made a trigger gesture. (Tr. at 30.) Rosado then turned to his right and saw Officer Matos. (Tr. at 31, 67.) Matos was holding a white sock, and said, in a low voice: "I found, you know, there's a gun in here." (Tr. at 31, 72.) Rosado looked inside the sock and saw a "small gun." (Tr. at 72, 79.) Rosado did not see Matos find the gun, nor did he question Matos about where the gun was found. (Tr. at 79.)

Rosado then went out to the living room, and asked Ms. Davis to get Mr. Peels' clothes. (Tr. at 34-35.) The detectives helped Mr. Peels get dressed, and then Rosado and other officers escorted Mr. Peels out of the apartment. (Id.)

### B.    Officer Eduardo Matos

#### 1.    *Entering the Apartment*

Officer Eduardo Matos – a six-year veteran who has been involved in over 70 arrests involving guns – testified that on September 29, 2007, he and his partner, Officer Tevales, responded to a radio call to join Detective Rosado and other officers outside the Decatur Apartment. (Tr. at 89, 93-94.) Matos was not given any specific instructions when he arrived, other than to lower his radio. (Tr. at 95.)

9

After Matos arrived, he was positioned about twenty paces from the door, with five detectives positioned between him and the doorway. (Tr. at 95-96.) One of the detectives began knocking on the door. (Tr. at 96.) When someone came to the door, the detective said, "NYPD, please open up." (Id.) Once the door was opened, Matos saw Ms. Davis peek out, and one of the detectives began talking to her. (Id.) Matos could not hear what was being said. (Id.) At some point, Matos and the other officers entered the apartment. (Tr. at 96-97.) Matos passed Ms. Davis as he entered the door, drawing his weapon as he crossed the threshold of the apartment. (Tr. at 97.) (Matos explained that he drew his weapon because he saw the detective in front of him draw his weapon. (Tr. at 99.) Ms. Davis did not attempt to stop Matos or the other officers from entering. (Id.)

2.    *Arresting Mr. Peels and Finding the Gun*

When Matos entered the apartment, he proceeded to look around, scanning left and right, as the detectives in front of him were doing. (Tr. at 97-98.) When he got deeper into the apartment, he heard a voice from outside of the apartment stating that Mr. Peels was in the bedroom. (Tr. at 98.) Standing at the living-room end of the hallway, with several detectives in front of him, Matos saw Mr. Peels standing in the middle of the bedroom. (Id.) Mr. Peels was standing still, but Matos believes that he "made a motion to his left side." (Tr. at 99.) After Matos entered the hallway, the detectives in front of him entered the bedroom and put Mr. Peels under arrest. (Tr. at 99.) When Matos entered the bedroom, he looked to his right (because of Mr. Peels' earlier motion to his left side), and saw, between the mattress and the lip of the bedframe, "a sock rolled up with something that appeared to be metallic. Not sticking out of the sock, but the curvature in the sock." (Tr. at 100-101.) The sock – a man's white gym sock -- was

10

rolled up like "if you're doing laundry and you take your socks and you roll it upon yourself to put away." (Tr. at 104-105.)

Seeing something that appeared hard in the sock, Matos proceeded to touch and squeeze it. (Tr. at 102.) He then picked it up, looked inside, and noticed that there was a pistol inside. (Id.) He then said "gun" in a loud manner so that everyone could hear him. (Tr. at 105.)

Matos believes that at the time he picked up the sock, Mr. Peels was still in the bedroom, and in the process of being placed into handcuffs. (Tr. at 112.) Matos indicated that Mr. Peels was restrained somewhere below the foot of the bed, while the gun was found by the head of the bed. (Tr. at 113-114; Def. Ex. W, floor-plan with handwritten notations by Officer Matos.)

### C.    Detective-Sergeant Michael O'Rourke

#### 1.    *Entering the Apartment*

Detective-Sergeant O'Rourke, the supervising officer at the scene of the arrest, testified that at the time the detectives sought entry into the Decatur Apartment, there were at least four detectives standing by the door, and at least four uniformed officers spread out down the hallway. (Tr. at 119.) At some point after a detective knocked, the door was opened. (Tr. at 120.) Rosado spoke to the woman who opened the door, but O'Rourke did not hear the discussion. (Id.) O'Rourke then entered the apartment. (Id.) He was either the first or second person to enter, and he did so with his gun drawn. (Tr. at 120, 122.)

#### 2.    *Arresting Mr. Peels and Finding the Gun*

O'Rourke, standing at the living room entrance to the hallway, saw Mr. Peels at the other end of the hallway, in the doorway of the bedroom. (Tr. at 121; Def. Ex. X, floor-plan with

handwritten notations by Sergeant O'Rourke). At the time, no other officers were in front of him. (Tr. at 122.) Detective Flores, who was standing to O'Rourke's right, also had his gun drawn. (Id.) When O'Rourke saw Mr. Peels, he and the other detectives hustled down the hallway. (Tr. at 123.) He then lost sight of Mr. Peels, who was walking within the bedroom from the left side to the right. (Id.) As the officers came down the hallway, Mr. Peels reappeared in the doorway. (Id.) That's when he "produced his hands, as if he was giving up to us. So it all happened very quickly." (Tr. at 123-24.) Mr. Peels held his hands above his head. (Tr. at 124.) When the officers entered the bedroom, Mr. Peels assisted the officers by putting his hands behind his back – "he wasn't resisting or anything like that." (Id.) O'Rourke does not remember whether he took hold of one of Mr. Peels hands. (Id.) He may have initially grabbed one of Mr. Peels' arms until one of the other detectives could assist. (Id.) Mr. Peels was standing below the foot of the bed when he was restrained. (Tr. at 125; Ex. X.) There were officers all around Mr. Peels, including officers on either side of him. (Tr. at 126.) Mr. Peels was placed in handcuffs – "I believe we had to use two pairs of handcuffs because he's a big guy," – and was escorted out of the bedroom. (Tr. at 124.)

Sergeant O'Rourke saw a sock lodged between the mattress and the bed frame by the head of the bed (where the "pillow area" would be). (Tr. at 127; Ex. X.) When he saw the sock, he did not go and pick it up. (Tr. at 127.) Instead, he directed the sock to Officer Matos's attention. (Id.) By the time Officer Matos picked up the sock, Sergeant O'Rourke was on the other side of the room. (Tr. at 127-128.) O'Rourke does not recall his exact conversation with Matos, but it was something to the effect of Officer Matos saying "'you didn't tell me it was a gun,' and I told him, I said, 'I thought you understood what I was pointing to, that you

12

understood what it was.'" (Tr. at 128.) O'Rourke does not remember whether Mr. Peels was still in the bedroom when he saw the sock, but by the time Officer Matos picked up the sock, Mr. Peels had been escorted out of the room. (Id.)

### D.    Sheila Nickens-Thomas

On April 7, 2008, Ms. Nickens-Thomas, an investigator for the United States Attorney's Office, went to the Decatur Apartment to interview Ms. Davis about the circumstances surrounding the arrest of Mr. Peels. (Tr. at 130-31, 139.) Ms. Nickens-Thomas asked Ms. Davis, among other things, whether she had given the police permission to enter her home on the afternoon of the arrest. (Tr. at 131.) Ms. Davis responded that she did not. (Id.) Later in the conversation, Ms. Davis told Ms. Nickens-Thomas that the police had never asked for her permission to enter the apartment. (Tr. at 134.) In addition, Ms. Davis told Ms. Nickens-Thomas that she was not familiar with the name Eric Peels. (Tr. at 139.)

### E.    Eric Peels

Eric Peels did not testify at the evidentiary hearing. In a Declaration dated July 3, 2008, Mr. Peels provided his recollection of the events surrounding his arrest: Mr. Peels stated that at some point in the afternoon of September 29, 2007, while he was standing in the hallway outside of the back room, he heard banging on the front door of the apartment and shouts of "Police!" (Peels Decl. ¶4.) Moments later, officers barged into the apartment with guns drawn, heading towards him and yelling, "Put your hands up! Put your hands up!" (Id.) Mr. Peels did not hear the police ask Ms. Davis for consent to enter or to search the apartment, nor did he hear Ms. Davis provide such consent. (Peels Decl. ¶8.)

As the police moved towards him, Mr. Peels backed into the bedroom with his hands

13

raised above his head. (Peels Decl. ¶5.) He stopped moving and was surrounded by police

officers. (Id.) He was then handcuffed with his hands behind his back, patted down, and brought

outside of the back room. (Id.) From where he was standing outside of the back room, Mr. Peels

could see officers searching inside the room, including one officer who was lifting the corners of

the mattress. (Peels Decl. ¶7.) This officer then came out of the back room into the room where

Mr. Peels was standing with other officers, and said, "I found something." (Id.) The officer was

holding a sock. (Id.)

## II.    **Proposed Findings of Facts**

The Court makes the following findings of fact:

### (1) Sergeant O'Rourke saw the sock and brought it to the attention of Officer Matos.

The Court credits Sergeant O'Rourke's testimony that he saw the sock and brought it to

Officer Matos's attention, rather than Matos finding the sock on his own. Matos testified that

upon entering the bedroom, while several detectives were in the process of restraining Mr. Peels,

he looked to his right,[1] saw the sock, observed something inside the sock that appeared to be

hard, touched and squeezed the sock, picked it up, looked inside it, saw a gun, and said "gun" in

a loud manner so that everyone could hear him. (Tr. at 99-100, 102, 105.) Sergeant O'Rourke

testified, though, that he saw the sock and directed it to Matos's attention. (Tr. at 127.) Given

the fact that O'Rourke was the supervising officer and Matos was a uniformed officer who was

---

[1]        Matos testimony as to the reason he began searching in the bedroom also lacks
credibility. Matos testified that while he was standing at the living-room end of the hallway, with
several detectives in front of him, he was able to discern a gesture on the part of Mr. Peels that
alerted Matos to the possible presence of a weapon. (Tr. at 99.) Neither Rosado nor O'Rourke,
who were in front of Matos at the time, testified to seeing such a gesture. What's more credible,
and consistent with Rosado and O'Rourke's testimony, is that Matos saw Mr. Peels raise his
hands in surrender.

14

there to provide back-up, it's more credible that Matos would wait for, and follow O'Rourke's lead rather than conducting a search and seizure on his own. Moreover, neither Sergeant O'Rourke nor Detective Rosado testified to hearing Matos say "gun" in a manner loud enough so that everyone in the bedroom could hear. O'Rourke testified that upon finding the gun, Matos said something to the effect of "you didn't tell me there was a gun in the sock," and Rosado testified that after he saw O'Rourke make a trigger gesture, he turned to Matos who said, "in a low voice," that he found a gun in the sock. (Tr. at 30-31, 128.)

### (2) Officer Matos did not know there was a gun in the sock until after he picked it up.

The Court finds that Officer Matos saw a hard object in the sock, but that he did not realize the sock contained a gun until after he picked it up. First, as set forth above, Sergeant O'Rourke testified that Matos expressed surprise that there was a gun inside the sock. (Tr. at 128.) Second, Officer Matos's testimony is internally inconsistent. Over the course of the direct examination, he became more emphatic about recognizing that the sock might contain a gun. See Tr. at 104 (Matos thought sock might contain a gun "from the time I saw it."). Matos's initial testimony, however, is that he did not know what was in the sock. He testified, "I saw a sock rolled up with *something* that appeared to be metallic. Not sticking out of the sock, but a curvature in the sock." (Tr. at 100, emphasis added.) Query how Officer Matos could discern the metallic nature of the "something" in the sock, but putting that aside, Officer Matos further testified that he "proceeded to touch it and squeeze it to see what it was and I felt something hard inside. At that time I picked it up, and I looked in, *and that's when I noticed* there was a pistol inside the sock." (Tr. at 102, emphasis added.)

15

Matos's initial testimony comports generally with the information that was apparently communicated to Detective Joseph, the "Trigger Lock" detective with the Firearms Enhancement Unit. The Complaint in this action, sworn to by Detective Joseph, states that an officer "saw what *appeared* to be a folded sock between the mattress and the wooden frame of the bed," and that it was only after the officer picked up the sock that he discovered that it contained a gun. (Compl. at ¶2(g), emphasis added). Given Sergeant O'Rourke's testimony, Officer Matos's initial testimony, and the information that was provided to Detective Joseph, the Court find that Matos was not aware that the sock contained a gun until after he picked it up.

(3) **Mr. Peels was no longer in the bedroom when Officer Matos picked up the sock.**

Both Sergeant O'Rourke and Detective Rosado's testimony supports a finding that Mr. Peels was no longer in the bedroom at the time. The Court finds their testimony to be more credible than Officer Matos's assertion that Mr. Peels was still in the bedroom and in the process of being placed into handcuffs when he picked up the sock. (Tr. at 112.) Mr. Peels' also stated in his Declaration that he was not in the room when the sock was found. (Peels Decl. ¶7.)

Sergeant O'Rourke testified that when the officers entered the bedroom, Mr. Peels was quickly restrained, with officers on either side of him. (Tr. at 125-126.) Mr. Peels was placed in handcuffs, and escorted out of the bedroom. (Tr. at 124.) O'Rourke does not recall whether Mr. Peels was still in the bedroom when he first saw the sock and brought it to Officer Matos's attention – the evidence suggests that Mr. Peels was not – but by the time Officer Matos picked up the sock, Mr. Peels was no longer in the bedroom. (Tr. at 128.)

Detective Rosado testified that while he did not see Officer Matos find the gun (Tr. at 79), he saw O'Rourke make a trigger gesture *after* Detectives Flores and Murphy had escorted

16

Mr. Peels out of the bedroom. (Tr. at 30.) It was then that Rosado turned to his right and saw

Matos holding the sock. (Tr. at 31, 33.)

Accordingly, the Court find that Mr. Peels was no longer in the bedroom when Officer

Matos picked up the sock.

(4) **Mr. Peels was arrested and restrained below the foot of the bed.**

Matos and O'Rourke both placed Mr. Peels' location at the time he was restrained as

below the foot of the bed. (Tr. at 113-114; Ex W (Matos); Tr. at 125, Ex. X (O'Rourke).

Rosado's testimony at the hearing was unclear as to where in relationship to the bed Mr. Peels

was restrained. He stated that Mr. Peels was about a push-up's distance from the bed (Tr. at 67),

but other testimony by Rosado suggests that Mr. Peels was further away from the bed. For

example, Rosado stated that after Mr. Peels was restrained, with detectives holding each arm,

Rosado was facing Mr. Peels while talking to him. (Id.) After Mr. Peels was escorted out,

Rosado turned around and saw the bed. (Id.) In other words, Rosado was between Mr. Peels and

the bed, which suggests that Mr. Peels was more than a push-up's distance away from the bed.

Moreover, before the Grand Jury, in testimony taken within a week of the arrest, Rosado stated

that he stopped next to the bed, while Mr. Peels was approximately four feet away. (Tr. at 69-70;

Def. Ex. G, People v. Peels, grand jury transcript, October 5, 2007.)

While Rosado does not specifically state that Mr. Peels was below the foot of the bed

when arrested, it is the most credible location. There is no testimony by any witness asserting

that Mr. Peels was between the bed and the side wall of the room. Had that been the case – given

the size of the room and the number of officers involved in the arrest – it would almost certainly

have been elicited during testimony.

17

Accordingly, the Court finds that at the time Mr. Peels was restrained, he was below the foot of the bed. Further, the testimony is consistent that once restrained, Mr. Peels did not move until he was escorted out of the back room. (Tr. at 27, 30, 124.)

**(5) Sergeant O'Rourke had his gun drawn while Rosado spoke to Ms. Davis concerning whether anyone else was in the apartment.**

Rosado testified that he and one other detective stepped into the apartment, at which point he began to discuss with Ms. Davis whether anyone else was in the apartment. (Tr. at 26.) Sergeant O'Rourke testified that he was either the first or second officer to enter the apartment, and that he did so with his gun drawn. (Tr. at 120, 122.) The Court thus finds that at the time Rosado was talking to Ms. Davis, O'Rourke had his gun drawn. Moreover, O'Rourke's testimony suggests that other officers also entered the apartment with guns drawn while Rosado was talking to Ms. Davis. For example, Sergeant O'Rourke testified that when he entered the hallway on the living room side, there were no other officers in front of him, and that Detective Flores was to his right with his gun drawn. (Tr. at 122.) This suggests that Flores was also in the apartment during Rosado's discussion with Ms. Davis. Given that Sergeant O'Rourke drew his gun upon entering the apartment, and Officer Matos drew his gun upon entering the apartment after seeing the detective in front of him do so (Tr. at 97), the Court finds it more likely than not that Flores also had his gun drawn during Rosado's discussion with Ms. Davis.

**Proposed Conclusions of Law**

I.    **Consent**

The Fourth Amendment prohibits unreasonable searches and seizures, and a search conducted without a warrant is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (internal quotation marks and citations omitted). One such exception is a search that has been consented to by a lawful occupant of the premises. United States v. Sanchez, 635 F.2d 47, 58 (2d Cir. 1980). In order for a such consent to be valid, it must be "voluntarily and freely given. It may not be the product of duress or coercion, flagrant or subtle." Id. Consent must be the product of an "individual's free and unconstrained choice," and not "mere acquiescence in a show of authority." See United States v. Wilson, 11 F.3d, 346, 351 (2d Cir. 1993).

The Government bears the burden of proving that consent was given voluntarily. Sanchez, 635 F.2d at 58. Voluntariness is a question of fact to be determined from the totality of the circumstances. Schneckloth, 412 U.S. at 227. Relevant considerations include the subject's knowledge of her right to refuse consent, the subject's level of education and intelligence, and whether she was deprived of food or sleep or subject to other physical abuse. Sanchez, 635 F.2d at 58.

The standard for measuring the scope of an individual's consent under the Fourth Amendment "is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the [consenting individual.]" Florida v. Jimeno, 500 U.S. 248, 251 (1991). The scope of a search is generally defined by its expressed object. Id.

### A.    No Consent To Enter

The Government has failed to prove by a preponderance of the evidence that the police received valid consent from Ms. Davis to enter the Decatur Apartment.  When Ms. Davis answered the door in response to two detectives banging on it, she was confronted with four or five detectives wearing bullet-proof vests standing outside her door, and at least four uniformed officers in the hallway.  It is not clear from the testimony whether any of the officers had their guns drawn at the time, but regardless, such a show of authority is inherently coercive.  There was no evidence presented that the police officers took any steps to reduce the coercive pressure of their entrance.  See United States v. Mapp, 476 F.2d 67, 78 (2d Cir. 1973) (agents "were required to take at least some minimal action designed to purge the situation of its coercive pressures.").  Moreover, Ms. Davis told the Government's investigator, Ms. Nickens-Thomas, that when the police arrived at the Decatur Apartment, they did not request permission to enter, nor did she provide such permission.  The fact that Ms. Davis did not try to prevent the officers from entering the apartment does not establish that she made a free and unconstrained choice to allow the police to enter.  The Government has not met its burden of proving that Ms. Davis did anything more than merely acquiesce in the face of a significant show of authority.

### B.    No Consent to Search the Apartment In Order To Arrest Mr. Peels

Even had the police received valid consent to enter, the scope of that consent could reasonably extend only to the entrance, and not to any further invasion of privacy.  There was no testimony that further consent to enter the apartment for the purpose of arresting Mr. Peels was sought or granted.  Rosado testified that he stood inside the apartment and asked Ms. Davis whether anyone else was staying in the apartment.  Ms. Davis responded with a name that

20

Rosado was not familiar with. Rosado then showed Ms. Davis a picture of Mr. Peels, to which, according to Rosado, Ms. Davis responded, "he's in the back room." According to Rosado, he immediately drew his gun and started walking further into the apartment, towards the hallway leading to the bedroom. At no point did any officer request permission to search within the apartment for the purpose of arresting Mr. Peels.

To the extent that "he's in the back room" could be construed as implicit consent to search within the apartment to arrest Mr. Peels, the Government has not established that such consent was voluntarily given. First, given that Ms. Davis was not familiar with the name Eric Peels, that the photograph of Mr. Peels was four-years old and depicts a person with long braided hair (while Mr. Peels had short hair on the day he was arrested), and that the "mugshot pedigree" image itself is quite degraded, it is not at all clear to whom Ms. Davis was referring to when she said "he's in the back room." In any event, the statement was made under inherently coercive circumstances. As described above, Sergeant O'Rourke and probably other officers had their guns drawn while Rosado was talking to Ms. Davis. And even without the drawn weapons, there were two or more officers in bullet-proof vests standing inside the apartment, with other officers standing in the doorway and out into the hall. The Government has failed to establish that Ms. Davis's purported consent was voluntarily given. Accordingly, such consent cannot justify the search within the Decatur Apartment. See Sanchez, 635 F.2d at 59 (Second Circuit has "refused to find consent when a police demand, with gun in hand, could very reasonably have been understood to mean that the officers intended to search the apartment whether thy had permission to do so or not.") (internal quotation and ellipses omitted).

21

Because the Government has failed to establish valid consent to enter the apartment or to search within the apartment for the purpose of arresting Mr. Peels, the evidence seized as a result of the entrance, and any statements made by Mr. Peels as a result of the arrest, must be suppressed.

**II.    No Justification to Search for and Seize the Gun**

Assuming, *arguendo*, that the police had lawfully entered the bedroom of the apartment for the purpose of arresting Mr. Peels, the Government has failed to establish a constitutional basis for the search and seizure of the gun.

In its pre-hearing response to Mr. Peels' motion, the Government did not contend that Ms. Davis provided consent for the search of the bedroom. Instead, the Government argued that the search was a legitimate part of a protective sweep, and, in any event, the gun was in plain view and thus could be seized. The Court addresses each of these arguments in turn.

**A.    Protective Sweep**

The Fourth Amendment permits law enforcement officers to conduct a limited protective sweep of a residence incident to an arrest "to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). A protective sweep may also encompass a search for weapons within the immediate control of a suspect who poses a threat to the safety of law enforcement officers. United States v. Blue, 78 F.3d 56, 59 (2d Cir. 1996). "Immediate control" means the "grab area" from which an arrestee might gain possession of a weapon or destructible evidence. Id. at 60. In determining whether an area is within an arrestee's

immediate control, courts "consider not only the arrestee's location, but also the nature of any restraints that have been imposed upon the person." Id.

Here, the Government elicited no testimony nor offered any evidence to establish that the gun was within Mr. Peels' immediate control, and the Court finds that it was not. First, for the reasons set forth above, the Court finds that Mr. Peels was not in the bedroom at the time Officer Matos discovered the gun. Because Mr. Peels was restrained in another room at the time Officer Matos discovered the gun, the weapon was not within Mr. Peels' grab area. See U.S. v. Williams, 2004 WL 1637021, at *4 (S.D.N.Y. July 20, 2004) (suspects' were handcuffed and guarded by officers in different rooms from where gun was found; gun suppressed).

Further, even were the Court to credit the testimony of Officer Matos, who testified that Mr. Peels was still in the bedroom when he picked up the sock, there was no evidence presented that the sock was within Mr. Peels' grab area. Instead, Mr. Peels was below the foot of the bed and surrounded by officers. The sock, on the other hand, was at the head of the bed, by the "pillow area." Even had Mr. Peels been in the room when the sock was found by Officer Matos, to Government has not established that it would have been possible for Mr. Peels to reach the gun. See Blue, 78 F.3d at 60 (gun not within arrestees' immediate control: no possibility of handcuffed arrestees reaching gun without being stopped by an agent).

### B.   Plain View

Under the "plain view" doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Minnesota v.

Dickerson, 508 U.S. 366, 375 (1993); United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999) ("Patently incriminating evidence that is in plain view . . . may be seized without a warrant.").

The Court finds that the Government has not met its burden of establishing the patently incriminating nature of the sock. First, Sergeant O'Rourke testified that he brought the sock to Officer Matos's attention. The Government elicited no testimony from Sergeant O'Rourke, however, about the characteristics of the sock that piqued his interest. Second, for the reasons set forth above, the Court finds that Officer Matos was not aware of the sock's incriminating character until *after* he picked it up. See e.g., United States v. Londono, 659 F. Supp. 758, (E.D.N.Y. 1987) (during protective sweep, officer thought block-shaped object might be weapon; flicked it with finger and it fell to floor, revealing $10,300. Suppressed: incriminating character apparent only after object touched.) Where a veteran officer who has participated in over 70 gun arrests cannot determine from looking at the sock that it contains a gun, the incriminating nature of the sock is not immediately apparent.

## CONCLUSION

For the reasons set forth above, it is respectfully requested that this Court enters an order suppressing the physical evidence and statements recovered from Mr. Peels by the New York Police Department on September 29, 2007,. which were obtained in violation of the Fourth Amendment to the United States Constitution.

Dated: New York, New York
      August 11, 2008

                    LEONARD F. JOY, ESQ.
                    Federal Defenders of New York, Inc.
                    Attorney for Defendant
                    **ERIC PEELS**
                    52 Duane Street - 10th Floor
                    New York, New York  10007
                    Tel.:  (212) 417-8737

                        s/ Martin S. Cohen
                        MARTIN S. COHEN
                        Of Counsel.

TO:    **MICHAEL J. GARCIA, ESQ.**
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York  10007
        Attn.:  **AMY R. LESTER, ESQ.**
                Assistant United States Attorney