# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Leonard F. Joy
*Executive Director*

*Southern District of New York*
John J. Byrnes
*Attorney-in-Charge*

August 15, 2008

<u>By Hand</u> and <u>ECF</u>

The Honorable John G. Koeltl
United States District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 1030
New York, NY 10007

Re:    **<u>United States v. Eric Peels,</u>**
       **08 Cr. 36 (JGK)**

Dear Judge Koeltl:

I represent Mr. Peels in the above-captioned case, and respectfully submit this letter in reply to the Government's Proposed Finding of Fact and Conclusions of Law In Further Response to the Defendant's Motion to Suppress, dated August 11, 2008.

For the reasons set forth in Defendant's Proposed Findings of Fact and Conclusions of Law ("Defendant's Brief"), the Government has failed to meet its burden of proving by a preponderance of the evidence that the warrantless entry and search of the Decatur apartment was lawfully conducted. In particular, the Government failed to establish that the police (1) received valid consent to enter; (2) received valid consent to search the apartment for the purpose of arresting Mr. Peels; (3) were justified in searching for and seizing the sock under the "protective sweep" doctrine, because the gun was not within Mr. Peels' immediate control; and (4) were justified in picking up and searching within the sock for the gun under the "plain view" doctrine, because the character of the sock itself was not patently incriminating.

In this letter I respond to several of the Government's factual assertions and arguments, and set forth why, in the absence of valid consent from Ms. Davis, the Government has failed to establish by a preponderance of the evidence that there were "exigent circumstances" present justifying the warrantless entry and search.

The Honorable John G. Koeltl
August 15, 2008
Page 2

## I.   Consent

### A.   *The Government Has Not Established That Ms. Davis's Statements to Investigator Nickens-Thomas Were Biased*

Patricia Davis, the tenant who opened the door of the Decatur apartment to the police, told Investigator Nickens-Thomas that the police never asked for, nor did she provide, consent for the officers' entry into her apartment. (Tr. at 131, 134.) The Government asserts that the Court should discount Ms. Davis's statement because of purported bias. In support of this assertion, the Government argues that the defense could have called Ms. Davis in order to prove that consent was involuntary. (Gov't's Brief ¶ 4.) The Government is attempting, though, to shift its burden of proof onto Mr. Peels. The burden is on the Government to prove that Ms. Davis's consent was freely and voluntarily given. The Government chose not to call Ms. Davis to impeach her credibility. Accordingly, the Court should credit Ms. Davis's statements, which support the conclusion that the Government did not meet its burden of proof in demonstrating valid consent.

### B.   *Ms. Davis's Conduct Shows Mere Acquiescence in a Show of Authority*

For the reasons set forth in Defendant's Brief at pp. 19-20, the Court should also reject the Government's assertion that the conduct of Ms. Davis provided implicit consent for entry into the apartment. None of the circumstances in the cases cited by the Government are analogous to the circumstances here, where about nine officers, in bullet-proof vests or uniforms, stood outside Ms. Davis's door when permission to enter was sought: See United States. v. Goncalves, 2008 WL 2080550, at *8 (N.D.N.Y. May 15, 2008) (single officer asked tenant where defendant was, and then followed her into the house; officer "made no show of authority."); United States v. Diaz, No. 96-1785, 210 F.3d 356 (Table), 2000 WL 357680, at *2 (2d Cir. Apr. 5, 2000) (single agent had ten to fifteen minute conversation with defendant during which defendant provided consent to search his car); United States v. Calvente, 722 F. 2d 1019, 1022 (2d Cir. 1983) (defendant apprehended after high speed chase and had rights read to him; consented to entry when agents explained they wanted to avoid an armed confrontation); United States v. Rosi, 27 F.3d 409, 411 (9th Cir. 1994) (agents arrested individual at ski resort; he asked to change out of his ski gear and gave agents key to condo); United States v. Garcia, 1273,1276-77 (9th Cir. 1993) (two officers posed as renters to gain access to an apartment, grabbed defendant, flashed badge and said, "we'd like to talk to you"; defendant consented, stepped back, and the officers entered).

Instead, the circumstances surrounding Ms. Davis's purported consent are much more akin to those in United States v. Mapp, 476 F.2d 67 (2d Cir. 1973). In Mapp, five or six officers, one of whom had his gun drawn, were in the apartment at the time consent was provided. 476 F. 2d at 78. No officer took even minimal steps to "purge the situation of its coercive pressures." Id. The Court found the consent involuntary: under those circumstances, consent was "nothing more than the mere acquiescence in and submission to lawful authority." Id. at 78-79.

The Honorable John G. Koeltl
August 15, 2008
Page 3

Moreover, as discussed in Defendant's Brief at pp. 20-22, even were the Court to find valid consent to enter, the Government has failed to establish that the police received valid consent to search the apartment for the purpose of arresting Mr. Peels. The discussion between Rosado and Ms. Davis concerning whether there was anyone else in the apartment was conducted in a highly coercive atmosphere, with officers inside and outside the apartment, some of whom likely had guns drawn. The Government presented no evidence that any officer sought to lessen the coercive pressure on Ms. Davis. Indeed, the Government presented no evidence that permission to search the apartment was ever sought. Rosado testified only that he showed Ms. Davis an old photograph of Mr. Peels and asked whether this was the person in her apartment, to which she responded, "he's in the back room." (Tr. at 29.) The Government has not established that under these circumstances, Ms. Davis provided an "essentially free and unconstrained choice" to permit the police to search within the apartment. United States v. Oguns, 921 F.2d 442, 448 (2d Cir. 1990) (internal quotation omitted). As persuasive authority that such consent was not valid, the Court may consider the Ninth Circuit precedent cited by the Government, under which a court will not infer both a request to search and the consent to do so. See Rosi, 27 F.3d at 412 (in the absence of specific request for permission, failure to object is not sufficient to establish voluntary consent: "We will not infer both the request and the consent." (quoting United States v. Shaibu, 920 F.2d 1423, 1428 (9th Cir. 1990)).

Finally, the Government asserts that Ms. Davis's purportedly non-confrontational and calm demeanor implied consent. Such a demeanor, though, is more consistent with submission in the face of a significant show of authority than as an indication of consent. It is more credible that, when Ms. Davis opened her door to a pack of "suited-up" and uniformed officers, she was fearful and submissive, rather than "very relaxed." (Tr. at 28.)

## II.    Protective Sweep

### A.    No Protective Sweep for Third Parties

The Government has not argued that the sock was found as part of a protective sweep for third parties who might pose a danger to the police. See Maryland v. Buie, 494 U.S. 325, 327 (1990) (protective sweep limited to cursory inspection of places where a person might be hiding). The Government *presented no evidence* that the sock was discovered during such a sweep – the police witnesses testified that the sock was lodged between the bed and the mattress, which is not an area where a person could be hiding – and the Court should find that the search for and seizure of the sock was not part of a lawful protective sweep for third parties. The Government contends, however, that the sock was within Mr. Peels' immediate control, and thus could be seized under the "grab area" prong of the doctrine. See United States v. Blue, 78 F.3d 56, 59 (2d Cir. 1996) (protective sweep includes areas within arrestee's immediate reach). The Government *presented no evidence*, however, in support of its assertion that the sock was within Mr. Peels' reach, and the Court should find that the Government has failed to meet its burden of proof on this issue.

The Honorable John G. Koeltl
August 15, 2008
Page 4

### B.    Mr. Peels Was In Other Room; Not In Grab Area

First, for the reasons set forth in Defendant's brief at pp.16-17, the Court should find that Mr. Peels was not in the bedroom when Officer Matos picked up the sock, and thus the "protective sweep" doctrine does not justify the seizure of the gun.

Officer Matos is the only witness who places Mr. Peels in the bedroom when the gun was found, but Matos's testimony, in general and on this particular point, is less credible than that of Sergeant O'Rourke's. (Def.'s Br. at 14-17.) In addition, Matos's testimony concerning what happened *after* he discovered the gun is consistent with Mr. Peels being out of the room at the moment of discovery.

Matos testified that right after recovering the gun – with Mr. Peels in the bedroom – "we proceeded to all exit the bedroom and go into the living room. They had Mr. Peels sit down so they could put some shoes on him, because he didn't have shoes on, and after that we left the location." (Tr. at 105-106.)

Rosado testified, though, that when he exited the bedroom, Mr. Peels was in the living room with detectives Flores and Murphy, and that Rosado and the other detectives helped him get dressed:

> They [Flores and Murphy] walked him out to the living room. After I spoke briefly with, I made that statement to Matos, I stepped out to the living room. And I wanted to talk to the lady from the apartment. He had no clothes on, Mr. Peels had no clothes on. So I turned to the lady, I said, "Ma'am, can you do me a big favor, can you get his clothes?"
>
> So she went in the back room, got his clothes. Detective Flores and Murphy were helping him put his pants on, but nobody wanted to buckle his pants. I went over there, I buckled his pants, pulled his zipper up, put his shoes on.

(Tr. at 33-34.)

In other words, Mr. Peels had already been in the living room with Detectives Flores and Murphy for a period of time before Rosado entered the living room. After Rosado joined them in the living room, there was a period of time during which Rosado spoke to Ms. Davis, Ms. Davis went into the bedroom and found clothes for Mr. Peels, and the detectives helped Mr. Peels get dressed, first putting his pants on, and then putting his shoes on. Matos's testimony that detectives were placing shoes on Mr. Peels when *he* entered the living room, directly after finding the gun, supports the chronology as testified to by O'Rourke and Rosado and set forth in Mr. Peels declaration – that Mr. Peels was escorted out of the bedroom before the gun was

The Honorable John G. Koeltl
August 15, 2008
Page 5

found. Since Mr. Peels was in another room from where the gun was found, restrained both by handcuffs and guarded by officers, the sock was not within his immediate control. See United States v. Williams, 2004 WL 1637021, at *4 (S.D.N.Y. July 20, 2004) (gun not in suspects' immediate control where they were handcuffed, guarded by officers, and in different rooms from where the gun was found).

### C.    No Evidence That Mr. Peels Could Have Reached Gun In Room

Second, even were the Court to find that Mr. Peels was in the bedroom when the sock was seized, the Government has not established that Mr. Peels might have been able to reach it. Indeed, no witness testified to Mr. Peels being able to reach the gun.

In Blue, the Court distinguished between circumstances where it was possible for a handcuffed detainee to get to a gun – describing the facts in United States v. Hernandez, 941 F.2d 133 (2d Cir. 1991) – and circumstances where it was impossible for a restrained detainee to get to the gun. 78 F.3d at 60. In Hernandez, an officer articulated the reasons he ran his hand along the side of the mattress despite the detainee being handcuffed, including: (1) the officer was planning to place the detainee on the bed; (2) if left unattended, detainee could have reached the gun from her perch on the bed; and (3) there was a real possibility that detainee might be left unattended. Blue, 78 F.3d at 60 (summarizing facts set forth in Hernandez, 941 F.2d at 135). Under the circumstances in Blue, however, there was no possibility that the handcuffed arrestees' – who were prone on the floor, two feet from the bed, their hands cuffed behind their back, guarded by an agent, with additional officers in the vicinity – could reach the gun under the mattress. 78 F.3d at 60. The Court accordingly held that, unlike in Hernandez, the protective sweep in Blue violated the Fourth Amendment.

Here, even were the Court to find that Mr. Peels was in the bedroom when the gun was found, he – like the arrestees' in Blue – could not have reached the sock. From the moment the police entered the bedroom to the moment he was escorted out of the room, Mr. Peels was standing below the *foot* of the bed, his hands behind his back as he was placed into handcuffs, a detective holding each arm, another officer standing in front of him (between Mr. Peels and the bed), and other officers in the vicinity. There was no possibility that he could have reached the sock, which was found lodged between the mattress and bedframe by the *head* of the bed.

At the least, the Government has put forth no testimony or other evidence to establish the fact that the gun was within Mr. Peels' reach, and has thus failed to prove by a preponderance of the evidence that the gun was within Mr. Peels' immediate control. Accordingly, the Court should find that the gun was not seized as part of a lawful protective sweep incident to the arrest of Mr. Peels.

### III.    Plain View

The Honorable John G. Koeltl
August 15, 2008
Page 6

The Government has failed to establish by a preponderance of the evidence that the incriminating character of the sock was immediately apparent, and thus the "plain view" doctrine does not justify picking up or searching within the sock for the gun. The testimony of O'Rourke and Matos, as well as the information provided to the "Trigger Lock" detective, was that the officers saw what appeared to be a sock. Sergeant O'Rourke testified that he saw "a *sock*, which was lodged in between the mattress and the bed frame on the bed." (Tr. at 127, emphasis added.) He then brought the sock to Officer Matos's attention. (Id.) Officer Matos testified that he saw a sock rolled up with "something" that appeared hard; that he touched and squeezed it, picked it up, *and then noticed* there was a pistol inside. (Tr. at 102, emphasis added.) Sergeant O'Rourke explained that at that point, Matos, surprised, said something to the effect of "you didn't tell me it was a gun." (Tr. at 128.) Detective Joseph, from the NYPD Firearms Enhancement Unit, testified in the sworn Complaint in this action that an officer saw "what *appeared* to be a folded sock between the mattress and the wooden frame of a bed." (Compl. at ¶ 2(d), emphasis added.)

Later in his testimony, Matos testified that he thought the sock might contain a gun "from the time I saw it." (Tr. at 104.) As an initial matter, the possibility that an object *might* contain contraband does not mean that the object is "patently incriminating" within the meaning of the "plain view" doctrine. See, e.g., United States v. Rudaj, 390 F. Supp. 2d 395, 406 (S.D.N.Y. 2005) (suppressing white plastic bag; bag did not reveal its incriminating contents, even though officers suspected bag contained contraband, and it resembled other properly seized items whose contents were visible); United States v. Londono, 659 F. Supp. 758, 762-63 (E.D.N.Y. 1987) (officer suspected block-shaped object might be weapon; suppressed, its incriminating character only became apparent after the object was moved). Moreover, Matos's testimony was not only internally inconsistent, it was also inconsistent on material points with the testimony of Sergeant O'Rourke and Detective Rosado. For reasons described in Defendant's Brief at pp. 14-16, the Court should credit O'Rourke's testimony that Matos did not know the sock contained a gun until after he picked it up.

After Matos expressed surprise that the sock contained a gun, O'Rourke responded: "I thought you understood what I was pointing to." (Tr. at 128.) This statement does not prove by a preponderance of the evidence that the incriminating character of the gun was immediately apparent. The statement suggests only that after Matos found the gun, O'Rourke boasted that he knew it all along. First, it's not credible that O'Rourke would recognize a gun in the bedroom and not seize it immediately. Second, the Government *elicited no testimony* from Sergeant O'Rourke concerning the character of the sock and why he brought the sock to Matos's attention. O'Rourke's unexamined boast is not enough to prove that the incriminating nature of the sock was immediately apparent. Matos, an experienced police officer, saw the sock up close, and yet the incriminating nature of its contents eluded him. O'Rourke's own testimony, and the information provided to the Trigger Lock detective, also support a finding that the police saw what appeared to be a sock, and that only after Matos picked the sock up did it become apparent that the sock contained a gun. The Government has not met its burden of proving that the incriminating nature of the sock was immediately apparent, and accordingly the seizure of the gun cannot be justified by the "plain view" doctrine.

The Honorable John G. Koeltl
August 15, 2008
Page 7

**IV.     Mr. Peels' Declaration**

       In material respects, Mr. Peels' Declaration concerning the events surrounding his arrest are consistent with the testimony of Detective Rosado and Sergeant O'Rourke, and the Court should give Mr. Peels' Declaration significant weight in its analysis.  For example,

- Mr. Peels stated that officers headed towards him yelling, "Put Your Hands Up! Put Your Hands Up!"  (Peels Decl. ¶4.)

  - Rosado: "Don't Move, let me see your hands, let me see your hands. (Tr. at 27.)

  - O'Rourke: "Don't resist, just come out with your hands up, let us see your hands."  (Tr. at 122.)

- Mr. Peels stated that when he was in the bedroom, he raised his hands above his head, stopped moving, and was surrounded by police officers.  (Peels Decl. ¶5.)

  - Rosado: "And then he put his hands up . . . . Detective Flores . . . and Detective Murphy, they went around me and they each grabbed one of his hands, arms, and then we, you know, stepped in."  (Tr. at 27.)

  - O'Rourke: "Once he showed his hands, his hands were up above his head.  When we entered into the bedroom, he assisted by putting his hands behind his back."  (Tr. at 124.)

- Mr. Peels was then handcuffed with his hands behind his back, patted down, and brought outside of the back room.  (Peels Decl. ¶5.)

  - Rosado: After Mr. Peels was placed in handcuffs, Detectives Flores and Murphy "walked him out to the living room."  (Tr. at 33; see also Tr. at 30.)

  - O'Rourke: After Mr. Peels was placed in handcuffs, he was escorted out of the bedroom.  (Tr. at 124.)

       For reasons described above and in Defendant's Brief at pp. 16-17, Mr. Peels was in the living room while Rosado, O'Rourke, Matos and other officers stayed in the bedroom.  At some point thereafter, Matos picked the sock up and discovered the gun.  Mr. Peels' statements, that he saw police officers searching the bedroom, and that an officer later came out holding a sock and

The Honorable John G. Koeltl
August 15, 2008
Page 8

said, "I found something," (Peels Decl. ¶ 7), are consistent with O'Rourke and Rosado's testimony. Accordingly, the Court should credit Mr. Peels' Declaration and accord it significant weight in its analysis.

## V.    `Exigent Circumstances

The Government has failed to meet its burden of proving that exigent circumstances justified their entrance in the absence of valid consent from Ms. Davis. The police – operating on an uncorroborated, anonymous tip – did not have sufficiently strong reason to believe Mr. Peels was at the Decatur apartment to justify the warrantless entry. Moreover, Detective Rosado's actions belied his testimony that there was a "real risk of danger." (Gov't's Brief at ¶37.) The police acted as they had prior to the purportedly threatening call – they went to apartments where Mr. Peels might possibly be found and hoped the tenants would provide valid consent. Finally, there was no testimony from the police concerning why they chose not to get a warrant, and certainly no evidence that there were barriers to their doing so.

In United States v. McDonald, 916 F.2d 766 (2d Cir. 1990), the Court identified the factors generally relevant to determining whether exigent circumstances justify a warrantless search, including: (1) the gravity of the offense; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry. 916 F.2d at 769. While no one factor is dispositive, "it will be a rare case in which exigency can support a warrantless entry without some showing of a reasonable belief that the person sought is inside the entered premises." United States v. Snype, 441 F.3d 119, 134 n.10 (2d. Cir. 2006) (no exigent circumstances: no reasonable basis to believe defendant on premises, despite finding other five McDonald factors supported a finding of exigent circumstances).

Here, there was no showing that the police had "strong reason" to believe that Mr. Peels was in the Decatur apartment. The police were operating solely on an anonymous tip, which bore no indicia of reliability, and concerned a person identified by a nickname – "BI" – which the officers were not familiar with. See Kerman v. City of New York, 261 F. 3d 229, 235 (2d Cir. 2001) (anonymous informants present obvious problems: their reputation for veracity cannot be assessed, and they cannot be held responsible if their allegations turn out to be fabricated). Indeed, an anonymous tip, without more, is insufficient for a Terry stop, let alone an invasion into a private home where the Fourth Amendment protection is the most stringent. See id. at 236.

At 4:50 pm on the afternoon of September 29, 2007, Detective Rosado received calls – first from a detective monitoring the Crimestoppers tip line, and then from the anonymous tipster himself – concerning where "BI" was hiding out. (Tr. at 21-22, Def. Ex. B, Complaint Follow-Up Report.) At the time he took the call, Rosado did not know to whom the nickname BI referred. (Tr. at 52.) The Government's assertion that there was evidence presented at the

The Honorable John G. Koeltl
August 15, 2008
Page 9

hearing that BI referred to Mr. Peels is of no moment. (Gov't's Brief at ¶11 n.4.)  What is crucial is that prior to the entry into the Decatur apartment, no officer involved in the arrest was familiar with the nickname BI, and the police took no steps to determine whether BI referred to Mr. Peels.  Rosado did not, for example, request that the tipster describe Mr. Peels, or provide some indication of the source of his knowledge to support his veracity.  Instead, Rosado assumed that the tipster was referring to Mr. Peels because he was the person Rosado and his colleagues had been looking for on the block earlier that day.  (Tr. at 51.)  The officers had been on the block, though, early in the morning, while the tip came in at 4:50 in the afternoon.  (Tr. at 11-12, Def. Ex. D, "Mugshot Pedigree" form with handwritten notations (indicating that Rosado and his colleagues went to another apartment on Decatur Avenue at 08:50 hours).)  There was no testimony that Mr. Peels was the only person the police were looking for on that day.

The tip did not carry with it any indicia of reliability, and the testimony at the hearing supports a finding that the officers were unsure whether they would find Mr. Peels at the address. Rosado testified, for example, that he knocked on the door, identified himself, entered the apartment with his gun holstered, and proceeded to discuss whether there was another occupant in the apartment with Ms. Davis.  When Ms. Davis responded with a name that Rosado was not familiar with, he then showed her an old photograph of Mr. Peels.  This entrance is consistent with the officers being unsure that Mr. Peels was in the apartment.

Moreover, Rosado's entrance into the apartment is inconsistent with his assertion that he took Mr. Peels' purported threat seriously.  (Tr. at 18-19.)  According to Rosado, Mr. Peels had threatened that the police would have to shoot him or he would shoot the police.  (Id.)  Had Rosado thought that Mr. Peels might enter the living room shooting at the officers, it is inconceivable that he would expose both himself and Ms. Davis (and anyone else who might have been in that apartment) to such danger while engaging in the questioning of Ms. Davis that he described.  (Tr. at 26, 28.)  Rosado's actions are instead consistent with his pre-phone call conduct.  He and other officers went to apartments where they thought Mr. Peels might be found, knocked on doors, and hoped that the tenants would provide consent to search.  (See·Tr. at 11-13.)

Finally, there was no testimony from the officers describing why a warrant could not have been obtained.  See United States v. Lavan, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (requiring persuasive showing for disregarding warrant requirement); N.Y. CPL. § 690.36 (oral application for search warrant may be communicated to a judge by telephone, radio, or other means of electronic communication).  Requesting a warrant would not have prevented the police from securing the apartment and building, which the police did upon arrival.  See Tr. at 25 (leaving two officers in front of the building).  The fact that they secured the apartment and building also militates against a finding that another of the McDonald factors – likelihood of escape – was present.

The Honorable John G. Koeltl
August 15, 2008
Page 10

        Accordingly, the Court should find that the Government has not met its burden of
proving by a preponderance of the evidence that exigent circumstances were present which
justified the searches in the absence of valid consent from Ms. Davis.

## CONCLUSION

        For the reasons set forth above and in Mr. Peels' Findings of Fact and Conclusions of
Law, the Government has not met its burden of proving by a preponderance of the evidence that
the entry into the Decatur apartment, the search within the apartment for Mr. Peels, and the
search for and seizure of the gun, all conducted without a warrant, were lawful under the Fourth
Amendment. The Court should therefore grant Mr. Peels' motion and enter an order suppressing
the gun, as well as statements made by Mr. Peels following the arrest and search, which were
obtained in violation of the Fourth Amendment to the United States Constitution.

                                        Respectfully submitted,

                                        LEONARD F. JOY, ESQ.
                                        Federal Defenders of New York, Inc.
                                        Attorney for Defendant
                                        **Eric Peels**

                                        Martin S. Cohen
                                        Of Counsel
                                        (212) 417-8737

cc:     Amy Lester, Esq.
        Eric Peels